1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

HENRY J. WHEELER,

                Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

CASE NO. C07-5248RBL-KLS

REPORT AND
RECOMMENDATION

Noted for June 13, 2008

17

18

19

20

21

22

       Plaintiff, Henry J. Wheeler, has brought this matter for judicial review of the denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After

reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and

Recommendation for the Honorable Ronald B. Leighton's review.

23

**I.**    **FACTUAL AND PROCEDURAL HISTORY**

24

25

26

27

28

       Plaintiff currently is 42 years old.[1]  Tr. 46.  He has a high school education and past work

experience as a machine specialist, door sprayer, pipe press operator, and PVC pipe stacker. Tr. 67, 81-86.

/

---

    [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

## A.     PROCEDURAL HISTORY

On March 31, 2004, plaintiff filed applications for disability insurance and SSI benefits, alleging disability as of February 3, 2003. Tr. 45-48.  His applications were denied initially and on reconsideration. Tr. 4-6, 35-36, 38-40.  A hearing was held before an administrative law judge ("ALJ") on October 19, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 12, 351-359.

On November 6, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had a "severe" impairment consisting of degenerative joint disease of the left (non-dominant shoulder);

(3)     at step three, plaintiff's impairment did not meet or equal the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     at step four, plaintiff had the residual functional capacity to perform a modified range of light work, with certain other manipulative non-exertional limitations, which precluded him from performing his past relevant work; and

(5)     at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 12-20.  Plaintiff's request for review was denied by the Appeals Council on March 22, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 4-6; 20 C.F.R. § 404.981, § 416.1481.  On April 2, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkts. #1 and #4). The administrative record was filed with the Court on August 13, 2007. (Dkts. #9-#10).  Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in failing to fully and fairly develop the record;

(c)     the ALJ erred at step two in failing to consider all of plaintiff's severe impairments;

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(d)     the ALJ erred in assessing plaintiff's credibility;

(e)     the ALJ erred in evaluating the other source medical evidence in the record;

(f)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(g)     the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

(Dkt. #11).  The undersigned agrees the ALJ erred, and, for the reasons set forth below, recommends that this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

**B**.     **REVIEW OF THE MEDICAL EVIDENCE**

1.     <u>Dr. Di Paola</u>

John Di Paola , M.D., is plaintiff's treating physician.  Tr. 108-110.  In February of 2001, plaintiff injured his left shoulder at work.  Tr. 108.  In June of 2001, Dr. Di Paola performed surgery on plaintiff's left shoulder, and plaintiff returned to work.  Tr. 108-110.

Plaintiff injured his left shoulder again on February 3, 2003 while at work.  Tr. 110. On March 7, 2003, Dr. Di Paola examined plaintiff and referred him for a cervical magnetic resonance image ("MRI") as well as an enhanced computed tomography ("CT") scan/anthrogram of the left shoulder.  Tr. 303.  Dr. Di Paola indicated on a "Release to Return to Work" form, dated March 7, 2003, that plaintiff was unable to push or pull with his left arm, and would be unable to lift more than 10 pounds with his left arm.  Tr. 304.  The MRI scan of Plaintiff's cervical spine, taken on March 12, 2003, showed degenerative disc disease with no significant nerve root compression.  Tr. 302.  The March 12, 2003 CT scan of plaintiff's left shoulder showed a posterior-superior labral tear.  Tr. 301.  Dr. Di Paola recommended surgery to repair the tear.  Tr. 299.  On March 17, 2003, Dr. Di Paola opined that plaintiff could perform work which required lifting more than 10 pounds occasionally, lifting less than 10 pounds frequently, and could not perform any overhead work.  Tr. 300.  These restrictions were continued until June 2, 2003.  Tr. 295-297. On July 15, 2003, Dr. Di Paola performed a second surgery on plaintiff's left shoulder.  Tr. 289.  On September 8, 2003, Dr. Di Paola opined that plaintiff could not perform work with his left arm.  Tr. 285.

On September 22, 2003, plaintiff was seen by Dr. Di Paola.  Tr. 280.  The examination was memorialized in a letter to Linda Willer, RN, of Oregon Health Systems.  Id.  Dr. Di Paola noted Plaintiff had developed a frozen shoulder.  Id.  Dr. Di Paola reported that Plaintiff had not been attending physical therapy, in part due to confusion regarding insurance coverage.  Id.

Dr. Di Paola performed a third surgery on plaintiff's left shoulder on September 30, 2003, and inserted a pain pump catheter.  Tr. 278.  The catheter was removed (Tr. 273) and on October 7, 2003, plaintiff was released to perform work which occasionally required lifting more than 10 pounds and frequently required lifting less than 10 pounds.  Tr. 276.  Plaintiff could not perform work requiring any crawling, climbing, reaching, pushing or pulling.  Id.  On October 21, 2003, Dr. Di Paola noted that plaintiff was not improving.  Tr. 272.  Dr. Di Paola prescribed Hydrocodine and Acetaminophen.  Id.

On November 3, 2003, Dr. Di Paola observed plaintiff's range of motion was significantly limited.  Tr. 270.  Plaintiff was noted to still have pain.  Id.  Dr. Di Paola opined that plaintiff should not return to work.  Id.  Mr. Wheeler's main complaint was his "significantly limited" range of motion in his left shoulder.  Id.  He also complained of decreased sensation in the left fourth and fifth fingers.  Id.  Dr. Di Paola performed a fourth surgery (manipulation and arthroscopy) on plaintiff's left shoulder on January 14, 2004.  Tr. 257.

On February 3, 2004, plaintiff returned to see Dr. Di Paola.  Tr. 253.  Mr. Wheeler was noted to be progressing very slowly with regard to range of motion of his left shoulder and was having discomfort.  Id.  He was prescribed more Hydrocodone.  Id.  Dr. Di Paola recommended that he continue off work.  Id.

On February 19, 2004, Plaintiff was noted by Dr. Di Paola to have "profound left anterior deltoid atrophy," (Tr. 250-252) and that it was "alarming to note the degree of degeneration" in the left shoulder (Tr. 251).  The plaintiff seemed to be managing on ibuprofen 800-mg and wanted to stay away from narcotics, but was not getting enough sleep.  Tr. 251.  Dr. Di Paola indicated concerns over plaintiff's ability to return to the work place at

1   his pre-injury capacity.  Id.  Dr. Di Paola anticipated that plaintiff could return to some very

2   sedentary work after his next visit and opined that plaintiff would have significant restrictions

3   on the use of his left arm.  Tr. 252.

4        Dr. Di Paola referred plaintiff to Scott R. Grewe, M.D., who saw plaintiff on March 11,

5   2004, (Tr. 123-24, 251) and to a neurologist, Todd D.L. Woods, M.D., who saw plaintiff on

6   March 24, 2004 (Tr. 136-39).  Dr. Woods ordered and reviewed an EMG-NCV test, and made

7   a diagnosis.  Tr. 129.  Dr. Grewe's opinion is discussed below in section 2 and Dr. Wood's

8   opinion is discussed in section 3.

9        On March 29, 2004, Dr. Di Paola observed that plaintiff "continued to manifest diffuse

10  and alarming degree of wasting of the entire musculature of the left shoulder including all

11  segments of the deltoid, a minor degree of the pectoralis, and severe supraspinatus and

12  infraspinatus wasting."  Tr. 233.  The plaintiff had "good strength of flexion and extension of

13  the elbow as well as intact motors of the intrinsics and extrinsics of the wrist and hand with no

14  numbness."  Id.  He found no atrophy below the level of the deltoid.  Id.

15       Plaintiff also saw Mr. Aspengren, his physical therapist on March 29, 2004.  His

16  opinion as to plaintiff's limitations is discussed in section 4.

17       An MRI was done on plaintiff's left shoulder on April 1, 2004.  Tr. 231.  The MRI

18  showed "abnormalities throughout all of the structures in the shoulder including prominent

19  edema throughout the subscapularis, supraspinatus, infraspinatus and teres minor muscles as

20  well as the humeral head and most of the scapula."  Id.  Dr. Christopher Morgan, M.D.'s

21  impression was plaintiff had "very abnormal signal intensity in the muscles and bones of the

22  shoulder with degenerative joint disease and a suspected neuropathic etiology."  Id.

23       On April 8, 2004, Dr. Di Paola discussed the April 1, 2004 MRI and diagnosis of upper

24  brachial plexopathy with plaintiff.  Tr. 229.  Dr. Di Paola told plaintiff his prognosis was

25  "grave."  Id.  In his chart notes, Dr. Di Paola opined that there was no intervention that could

26  be performed to restore plaintiff's shoulder function.  Id.  He was of the opinion that plaintiff

27  will have a "very definite and significant impairment."  Id.  He prescribed Prednisone, (Id.),

28  recommended plaintiff remain off duty (Id.) and continued that recommendation on April 15,

2004 (Tr. 227).  On April 22, 2004, Mr. Wheeler was again seen by Dr. Di Paola.  Tr. 223.

Plaintiff noted some "change in his shoulder musculature following the first week of steroid

medications."  Id.  He was able to move his should a little more actively.  Id.  Plaintiff was still

very weak.  Id.  He reported having difficulty sleeping.  Id.  Dr. Di Paola recommended that he

remain off work.  Tr. 224.

Dr. Di Paola diagnosed plaintiff with a major plexopathy[3] in early May 2004.  Tr. 222.

On May 6, 2004, Dr. Di Paola opined, in relevant part, that plaintiff was capable of performing

work involving left hand fine manipulation, grasping, and keyboarding, but there could be no

pushing or pulling with his left hand.  Tr. 225.  Dr. Di Paola believed that plaintiff was not

able to push/pull with his left arm, crawl, climb, or reach.  Id.  He found no sitting, standing, or

walking restrictions.  Id.

Dr. Di Paola next examined plaintiff on September 5, 2006.  Tr. 336-37.  The plaintiff

reported that his shoulder has continued to be quite painful.  Tr. 336.  Examination

demonstrated "profound wasting of the deltoid, subscapularis, supraspinatus, infraspinatus,

and teres minor muscles"  Id.  Dr. Di Paola noted that plaintiff did not have any "appreciable

activity in the subscapularis, infraspinatus, or teres minor"which reflected "a worsening from

his prior condition."  Id.  Dr. Di Paola observed diminished light touch sensation through the

fourth and fifth digits of the left hand.  Tr. 337.  Dr. Di Paola opined that plaintiff's work

restrictions remained the same.  Id.

2.    Dr. Grewe

Plaintiff was examined by Scott R. Grewe, M.D., on March 11, 2004 for purposes of a

second opinion regarding his left shoulder.  Tr. 123-24.  Dr. Grewe observed plaintiff had

"diffuse shoulder pain proximally" with severely limited range of motion in his left shoulder.

Tr. 123.  The plaintiff had "obvious atrophy of his deltoid muscle involving primarily the

anterior aspect," with "visible atrophy of both the supraspinatus and infraspinatus portion

posteriorly."  Id. at 124.  Plaintiff was observed to have diffuse weakness in his left shoulder,

---

[3]MedlinePlus defines brachial plexopathy as decreased movement or sensation in the arm or shoulder due to a nerve problem.  Found in http://www.nlm.nih.gov/medlineplus/ency/article/001418.htm. It occurs when there is damage to the brachial plexus, an area where a nerve bundle from the spinal cord splits into the individual arm nerves.  Id.

1   and was noted to have "weakness to his thumb extension," and some weakness to elbow

2   extension and normal elbow flexion.  Id.  Plaintiff reported pain as a ten on a scale of one to

3   ten, and reported being in pain at night.  Id. at 123.  Dr. Grewe's impression was that plaintiff

4   had left shoulder pain, adhesive capsulitis, and atrophy.  Id. at 124.

5           3.   <u>Dr. Woods</u>

6        On March 24, 2004, plaintiff was examined by Todd D.L. Woods, M.D., a neurologist.

7   Tr. 136- 139.  Dr. Woods observed that Plaintiff had, at best, "3/5 strength of the left shoulder

8   abductors, anterior elevators, internal rotators, and external rotators."  Tr. 138.  He found

9   probable atrophy of the left deltoid and pectoralis group and noted that plaintiff had "5/5

10   strength testing of the left biceps, triceps, brachial radialis, forearm pronators, supinators, wrist

11   extensors, flexors, and intrinsic hand muscles."  Id.  Dr. Woods opined:

> This patient's differential diagnosis consists of a brachial plexopathy vs.
> multiple mononeuropathies vs. impaired shoulder range of motion with disuse
> atrophy.  It may be a combination of these such as a mononeuropathy causing
> some shoulder weakness and shoulder range of motion limitations causing
> disuse atrophy of other musculature.  The absence of apparent sensory loss in
> the left upper extremity makes brachial plexopathy less likely.

Tr. 139.  Dr. Woods ordered a full diagnostic EMG-NCV.  Id.  After reviewing the EMG-NCV

results, Dr. Woods' March 30, 2004 impression was that plaintiff had

> 1) A mild-moderate chronic lower trunk brachial plexopathy[4], with mild
> chronic denervation in the left abductor pollicis brevis muscle and abnormal
> left ulnar mixed and sensory responses and an absent left medial antebrachial
> cutaneous response, and
>
> 2) A moderate-severe left upper trunk or lateral cord with associated
> suprascapular and long thoracic mononeuropathies[5] with active denervation in
> multiple muscles.

Tr. 129.  Dr. Woods opined that plaintiff's "shoulder atrophy and impaired range of motion is

therefore secondary to neurogenic causes rather than purely related to shoulder range of

motion restrictions from joint disease.  The extent of his EMG abnormalities portends a poor

prognosis."  Tr. 126.  Dr. Woods recommended a course of prednisone.  Tr. 127.

---

[4]  See footnote 2.

[5]  MedlinePlus defines Mononeuropathy as "damage to a single nerve or nerve group, which results in loss of movement or sensation."  http://www.nlm.nih.gov/medlineplus/ency/article/000780.htm.  It is "a type of peripheral neuropathy (damage to nerves outside the brain and spinal cord)."  Id.

/

4.     Physical Therapist

Erik J. Aspengren, a physical therapist, treated plaintiff's left shoulder from September 30, 2003 to April 1, 2004.  Tr. 141-197.  On March 29, 2004, Mr. Aspengren opined that plaintiff could not lift, carry, or handle objects with his left arm.  Tr. 141.  Mr. Aspengren opined that Plaintiff could not sit, stand, move about, hear, speak, see, and travel for 2/3 of a day.  Id.

**B.     PROCEDURAL HISTORY**

On March 31, 2004, plaintiff filed applications for disability insurance and SSI benefits, alleging disability as of February 3, 2003. Tr. 45-48.  His applications were denied initially and on reconsideration. Tr. 4-6, 35-36, 38-40.  A hearing was held before an administrative law judge ("ALJ") on October 19, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 12, 351-359.

On November 6, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)    at step one of the sequential disability evaluation process,[6] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had a "severe" impairment consisting of degenerative joint disease of the left (non-dominant shoulder);

(3)    at step three, plaintiff's impairment did not meet or equal the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)    at step four, plaintiff had the residual functional capacity to perform a modified range of light work, with certain other manipulative non-exertional limitations, which precluded him from performing his past relevant work; and

(5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 12-20.  Plaintiff's request for review was denied by the Appeals Council on March 22, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 4-6; 20 C.F.R. § 404.981, § 416.1481.  On April 2, 2007, plaintiff filed a complaint in this Court seeking

---

[6]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

review of the ALJ's decision. (Dkts. #1 and #4).  The administrative record was filed with the Court on August 13, 2007. (Dkts. #9-#10).  Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

    (a)    the ALJ erred in evaluating the medical evidence in the record;

    (b)    the ALJ erred in failing to fully and fairly develop the record;

    (c)    the ALJ erred at step two in failing to consider all of plaintiff's severe impairments;

    (d)    the ALJ erred in assessing plaintiff's credibility;

    (e)    the ALJ erred in evaluating the other source medical evidence in the record;

    (f)    the ALJ erred in assessing plaintiff's residual functional capacity; and

    (g)    the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

(Dkt. #11).  The undersigned agrees the ALJ erred, and, for the reasons set forth below, recommends that this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## II.   DISCUSSION

    This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

## A.   ALJ's EVALUATION OF THE MEDICAL EVIDENCE

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility."  Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Id.  The ALJ also may draw inferences "logically flowing from the evidence."  Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion."  Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her.  Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected."  Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant.  Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and

inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

   1. Dr. Di Paola

  Plaintiff argues that the ALJ failed to properly address the February 19, 2004, March 29, 2004 and September 5, 2006 opinions of Dr. Di Paola. (Dkt. #13). While being mindful that "[t]he mere existence of an impairment is insufficient proof of a disability," let alone a decreased ability to work, Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993), the ALJ erred in his treatment of the September 5, 2006 opinion of Dr. Di Paola. Although the ALJ stated that he adopted Dr. Di Paola's opinion on plaintiff's restrictions, he failed to include all of them in his RFC or hypothetical question to the vocational expert. Accordingly, the ALJ failed to discuss all the "significant probative evidence," Vincent, at 1395, as found by Dr. Di Paola. This error impacts the ALJ's assessment at step four and five of the sequential analysis.

  The ALJ did not commit error in not discussing Dr. Di Paola's February 19, 2004 opinion that plaintiff would have "significant restrictions" in the use of his left arm. "Significant restrictions" is a general phrase, revealing nothing about plaintiff's specific work place limitations. The ALJ's RFC assessment may be said to incorporate "significant restrictions," such that the ALJ need not address the term "significant restrictions" in his opinion. Additionally, contrary to plaintiff's assertions, the ALJ did not commit error in not discussing Dr. Di Paola's March 29, 2004 opinion. The opinion discussed plaintiff's failure to progress, but did not further elaborate on his work related limitations as a result.

  Plaintiff argues that the ALJ erred in failing to address Dr. Di Paola's diagnosis of plexopathy at step two of the sequential analysis. (Dkt. #11). Dr. Di Paola's diagnosis came after plaintiff saw Dr. Woods, the neurologist, for a second opinion. Tr. 222, 229. Dr. Woods

opined that plaintiff's shoulder atrophy and impaired range of motion was "secondary to neurogenic causes rather than purely related to shoulder range of motion restrictions from joint disease." Tr. 126. Plaintiff's treating physician's diagnosis of plexopathy was "significant probative evidence." Vincent, at 1395. The ALJ's failure to discuss Dr. Di Paola's diagnosis of plexopathy was an error.

### 2. Dr. Grewe

Plaintiff assigns error to the ALJ's failure to address Dr. Grewe's opinion. (Dkt. #11). The ALJ did not err in not addressing Dr. Grewe's opinion. Dr. Grewe's findings regarding plaintiff's range of motion and pain were no different than Dr. Di Paola's findings on those issues. The thumb weakness did not result in a related diagnosis. Dr. Grewe did not find or imply any limitations related to the thumb, and showed no interest in any follow up testing. The ALJ's not discussing Dr. Grewe's opinion was not error.

### 3. Dr. Woods

Plaintiff argues that the ALJ erred in his assessment of Dr. Woods' opinion. (Dkt. #11). In reviewing the medical opinions of Dr. Woods, the ALJ noted that "Dr. Woods opined that a 'full diagnostic EMG-NCV (electromyelgram-nerve conduction velocity) test' be accomplished in order to reach a more conclusive diagnosis." Tr. 15. The ALJ then failed to address Dr. Woods' opinion on the EMG-NCV test results. The ALJ did not discuss Dr. Woods' diagnosis of lower trunk plexopathy or upper trunk mononeuropathies or address Dr. Woods' opinion of plaintiff's nerve damage as it relates to his prognosis. However, Dr. Woods did not assess any functional restrictions that were greater than those found by Dr. Di Paola. Consideration of Dr. Woods' opinion is appropriate on remand, though the ALJ's treatment of Dr. Woods was not more than harmless error.

### 4. Mr. Aspengren - Other Medical Evidence

Plaintiff argues that the ALJ erred in failing to consider Mr. Aspengren's opinion on plaintiff's limitations. (Dkt. #11). As a physical therapist, Mr. Aspengren is not an "acceptable medical source" as that term is defined in the Social Security Regulations, and thus may be given less weight than those of acceptable medical sources. See Gomez v. Chater,

74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (acceptable medical sources include licensed physicians).  Evidence from "other sources," including other "medical sources" such as therapists, however, may be used to "show the severity" of a claimant's impairments and their effect on the claimant's ability to work. 20 C.F.R. § 404.1513(d), § 416.913(d).

The ALJ committed harmless error in failing to take into account Mr. Aspengren's assessment of plaintiff's "impairment severity and functional effects," as required by SSR 06-03p.  The Commissioner argues that the ALJ must "only discuss significant probative evidence," and Mr. Aspengren's opinion that Plaintiff could sit, stand, move about, hear, speak, see, and travel for 2/3 of a day, (Tr. 141), is not significant or probative evidence.  (Dkt. #13, at 13).   The undersigned agrees.  There is no evidence in the record that plaintiff has limitations on his ability to sit, stand, move about, hear, speak, see, or travel.

Moreover, like Mr. Aspengren, the ALJ included lifting and carrying restrictions in his assessment of plaintiff's RFC.  Tr. 17.  The Commissioner points out that the only limitation that Mr. Aspengren opined plaintiff had that the ALJ did not find, was an inability to handle objects with his left hand.  Id., at 13-14.  Mr. Aspengren's check in the box form actually stated that plaintiff was unable to handle objects with his left **arm**.  Tr. 141 (*emphasis added*). It is unclear how someone handles items with the left arm.  In any event, Mr. Aspengren opined that plaintiff's left arm activity was limited, and as such, did not add to those limitations found by Dr. Di Paola.  Accordingly, the undersigned cannot say that the failure to discuss Mr. Aspengren's opinion was error.

5.   Conclusion of the ALJ's Assessment of the Medical Record

The ALJ's assessment of the medical record was in error.  Remand is appropriate for reconsideration of the medical evidence.  Plaintiff urges that the court, at a minimum, find that plaintiff was disabled for the period of February 3, 2003 to May 6, 2004 based solely upon the medical record.  His argument appears to be based on his claim that the doctors said he could not work for over a year due to his left shoulder condition.  The record does not support the assertion that for 15 continuous months the plaintiff was not able to engage in substantial

gainful activity.  To be found disabled, plaintiff must establish that he was unable to "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Plaintiff has failed to show that he is entitled to an immediate award of benefits for this period.  The record indicates that from March 7, 2003 to June 2, 2003, Dr. Di Paola opined that Plaintiff had restrictions in his ability to perform work related activities with his left arm.  Tr. 295-297, 300, 304.  Although on September 8, 2003, Dr. Di Paola opined plaintiff could not work at all with his left arm, on October 7, 2003, Dr. Di Paola believed plaintiff could perform work with restrictions.  Tr. 276, 285.  On November 3, 2003, Dr. Di Paola opined that plaintiff was unable to work due to his impairments.  Tr. 270.  This recommendation remained in place until May 6, 2004, when Dr. Di Paola believed plaintiff could return to work with restrictions.  Even if these restrictions are fully credited, further analysis on whether plaintiff had the residual functional capacity to engage in his past work or "work existing in significant numbers in the national economy" is still required in order to decide whether plaintiff is entitled to benefits.   Plaintiff has failed to show that he is entitled to a remand for an immediate award of benefits for the period of February 3, 2003 to May 6, 2004 on the current record.  The undersigned takes no position as to whether an award of benefits may be available for this period of time after re-review of the case through the five step sequential analysis.

### B.       THE ALJ'S DEVELOPMENT OF THE RECORD

The ALJ, in a social security case, has a duty to fully and fairly develop the record even where the claimant is represented by counsel.  De Lorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991); Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983).

Plaintiff contends that the ALJ failed to properly develop the record by not asking him questions regarding his range of motion, pain, and lack of sensation problems.  (Dkt. #11).  The undersigned disagrees and concludes that the ALJ fulfilled his duty to develop the record.  The ALJ included plaintiff's range of motion limitations when he assessed plaintiff's RFC.

The ALJ found that he could "perform non-frequent manipulation of objects from waist level to shoulder level with his non-dominant left arm," was "precluded from any lifting and carrying with his left arm and shoulder," due to pain, and could not reach or grasp "above shoulder level with his left arm." Tr. 17. The ALJ considered the effect of plaintiff's pain when assessing his RFC when he precluded any lifting or carrying. *Id*. As to plaintiff's reduced sensation in some of his left fingers, there is nothing in the record that led to any type of manipulative restrictions based on these symptoms, other than the push/pull restrictions. The ALJ included plaintiff's push/pull restrictions in the RFC. Tr. 17. In fact, Dr. Di Paola opined that plaintiff could engage in work involving left hand fine manipulation, grasping, and keyboarding, but not pushing or pulling with his left hand. Tr. 337 and 225. The ALJ did not err in his development of the record.

### C.   THE ALJ'S STEP TWO ANALYSIS

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe."   An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. [§ 404.1521(b)][,] [§ 416.921(b)]; SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

At step two of the disability evaluation process, however, although the ALJ must take into account a claimant's pain and other symptoms (see 20 C.F.R. § 404.1529), the severity

determination is made solely on the basis of the objective medical evidence in the record:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. <u>At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.</u> If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added).

The ALJ failed to properly consider all of plaintiff's severe impairments at step two. The ALJ found that plaintiff had a severe impairment of degenerative joint disease of the left (non-dominate) shoulder. Tr. 14. In addition to the diagnosis of degenerative joint disease of the left arm, Dr. Di Paola diagnosed plaintiff with upper brachial plexopathy. Tr. 229. The ALJ did not include this diagnosis his step two findings. The ALJ also failed to address the neurologist, Dr. Woods', diagnosis of mild-moderate chronic lower trunk brachial plexopathy and moderate-severe left upper trunk mononeuropathies. Tr. 129. Failing to consider diagnosis related to nerve damage is not harmless because the diagnosis of degenerative joint disease did not identify the full extent of plaintiff's impairments with regard to the limited range of motion and muscle atrophy, which according to Dr. Woods was related to neurogenic causes and not just restrictions due to joint disease (Tr. 126). The additional diagnosis, while related to the left shoulder, more accurately reflects the severity of the impairment and should have been identified. The ALJ's failure to identify all of plaintiff's severe impairments was in error, and the matter should be remanded for consideration of these impairments.


D.     **THE ALJ ERRED IN ASSESSING PLAINTIFF'S CREDIBILITY**

Questions of credibility are solely within the control of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. <u>Allen</u>, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. <u>Id.</u>

REPORT AND RECOMMENDATION
Page - 16

at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility as follows:

The undersigned reminded the claimant that his doctor released him for light work with no use of the left (non-dominate) arm in April 2004 (Ex. 8F/pg. 218-219).  His attorney rebutted however that further surgery is being considered for the claimant.  The claimant did not testify per se regarding his activities of daily living, however the undersigned notes from the record that the claimant acknowledged in May of 2004 that he could not sit or walk for longer than 15-minutes at a time, nor stand for more than 10-minutes at a time (Ex. 5E/pg. 32). The undersigned notes by the claimant's own testimony that his only remaining impairment is his left shoulder degenerative joint disease.  The undersigned notes that he has never reported any dyspnea (i.e. shortness of breath) and he is not obese, standing 5 feet, 11-inches, weighing 200-pounds (Ex. 5E/pg. 18). Accordingly, there are no medical records to corroborate any limitations in his capacity to sit, stand, and walk.

In reporting his activities of daily living, the claimant also acknowledges that he can prepare meals; does grocery shopping; drives; has functional hearing and eyesight; sleeps 5-8 hours a night and only takes 800 mgs of Ibuprofen "three times a day," with no reported side-effects (Ex. 5E/pgs. 29-31).  He also reports doing chores, except now only with one hand, however he is right-hand

dominant.  The claimant also alleges difficulty in climbing stairs and that he also requires a daytime nap of 1 to 2 hours a day (Ex. 5E/pgs. 30-31).  In comparison to the medical evidence of the record, the claimant has no medical etiology to corroborate an inability to climb stairs or need a nap during the day - everyday.  Accordingly, based on the above comparisons of the claimant's subjective claims versus the objective medical signs and findings in the record, the undersigned finds the claimant's overall allegation of significant physical limitations are not entirely credible.

Tr. 17.

In assessing plaintiff's credibility, the ALJ relied almost exclusively on a questionnaire filled out by plaintiff in May of 2004.  Tr. 87-91.  The ALJ first found plaintiff's answer in the questionnaire, that he could not sit or walk for longer than 15-minutes and could not stand for more than 10-minutes, as less than credible.  Careful review of the medical record shows that there is no basis for these limitations, and in fact, there is medical evidence to the contrary. Dr. Di Paola found that plaintiff had no restrictions in his ability to sit, stand, or walk.  Tr. 225. Accordingly, the ALJ's reason for rejecting plaintiff's allegations, that there is nothing in the medical record that supports the claim, was a "clear and convincing" basis upon which to reject plaintiff's assertions on his ability to sit, walk, and stand.  Lester, 81 F.2d at 834.  The undersigned notes that this subjective complaint was only alleged once in this single form. This finding by the ALJ, although not in error as to the specific claim, is of marginal relevance.

The ALJ erred in discounting plaintiff's credibility regarding his ability to climb stairs. The portion of the record cited by the ALJ dealing with stairs states: "Do you have to climb stairs?  If yes, how does it affect you?"  Tr. 88.  Plaintiff answered "no."  Id.  Thus, this does not afford a basis to question the plaintiff's credibility.  The undersigned finds the ALJ erred in discounting plaintiff's credibility for this reason.

The ALJ erred in finding plaintiff less than credible based upon plaintiff's alleged need for a daily one to two hour nap.  The ALJ cites the questionnaire, which reads: "Do you require rest periods or naps during the day?"  Tr. 89.  Answer: "Yes."  Id.  The questionnaire continues, "If yes, how often and how long?"  Id.  Answer: "1 Hour or 2 a day."  Id.  The ALJ asserts that such an allegation is not supported by the medical record.  The record indicates that on February 19, 2004, the plaintiff reported to Dr. Di Paola that he was not getting restful

sleep.  Tr. 251.  Dr. Di Paola prescribed Vicodin to be taken at bedtime as needed for sleep only.  Tr. 251.  The record also indicates that on March 11, 2004, the plaintiff reported to Dr. Grewe that he was having pain at night.  Tr. 123.  Plaintiff again reported having difficulty sleeping on April 22, 2004.  Tr. 223.  The ALJ found that plaintiff's claim was not supported by the objective medical evidence, and therefore not credible.  Tr. 17.  A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement.  Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  However, a claimant's pain testimony may not be rejected "solely because the degree of pain alleged is not supported by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc)) (emphasis added); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).  The same is true with respect to a claimant's other subjective complaints.  See Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir. 1995) (finding that while holding in Bunnell was couched in terms of subjective complaints of pain, its reasoning extended to claimant's non-pain complaints as well).  At best, this evidence is ambiguous as to whether plaintiff needs to nap during the day.  The undersigned makes no finding as to whether plaintiff, in fact, needs a nap, or whether that need would effect his ability to engage in regular work.  However, because plaintiff's claim is not "inconsistent with clinical observations," and the ALJ offers no other basis, aside from the medical evidence to reject it, the ALJ has not offered "clear and convincing" reason, Lester, 81 F.2d at 834, to reject plaintiff's credibility.

The ALJ states that based on comparing plaintiff's above subjective claims with the objective medical evidence, he finds that plaintiff's overall "allegation of significant physical limitations" is less than credible.  Tr. 17.  Although the ALJ can consider "ordinary techniques of credibility evaluation," Smolen, at 1284, in deciding whether plaintiff is credible, the undersigned notes that the ALJ improperly assessed his credibility as to two of his subjective claims, and properly assessed his credibility regarding subjective claims of limited relevance.

Additionally, it is unclear here whether the ALJ relied on plaintiff's daily activities in

assessing plaintiff's credibility.  The ALJ did list plaintiff's daily activities.  The ALJ may

consider his daily activities to determine whether a claimant's symptom testimony is credible.

Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a

substantial part of his or her day performing household chores or other activities that are

transferable to a work setting." Id. at 1284 n.7.

To the extent that the ALJ also found plaintiff's activities of daily living undercut his

claim that he has "significant physical limitations," the ALJ erred.  Tr. 17.  The ALJ again

cited the May 2004 questionnaire in discussing plaintiff's reported activities of daily living.

Tr. 87-91.  Specifically the ALJ noted plaintiff cooks meals, grocery shops, drives, and does

chores with one arm.  Tr. 17.  On the questionnaire plaintiff did report cooking and driving

short distances.  Tr. 88-89.  He indicated that he grocery shopped once a month and that his

daughter carried the groceries for him.  Tr. 88.  Plaintiff answered "no" to both questions of

whether he cleaned his own living space and whether he did yard work.  Id.  He did note,

however, that he did "everything one handed" and his daughter helped him.  Id.  He reported

he could only perform housework for half an hour due to pain.  Tr. 89.  To the extent that the

ALJ found plaintiff less than credible based on his activities of daily living, the ALJ's

assessment was in error.  A claimant need not be "utterly incapacitated" to be eligible for

disability benefits.  Smolen, 80 F.3d at 1284.  The ALJ does not point to any similarity

between plaintiff's activities of daily living and work place requirements.  Id. (many home

activities may not be easily transferable to a work environment).  Moreover, the ALJ

acknowledged that he did not question plaintiff at the hearing regarding his activities of daily

living.  The questions the ALJ did ask plaintiff regarding his limitations were often compound

questions, leaving the answer unhelpful.

While, as discussed above, not all of the ALJ's stated reasons for discounting

plaintiff's credibility were improper, the majority of them were.  An ALJ's credibility

determination is not valid if unsupported by substantial evidence in the record, even though

some of the reasons for discounting the testimony of the claimant may be valid.  Tonapetyan,

242 F.3d at 1148.  Such is the case here.

1

2

### E.    THE ALJ ERRED IN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

3

If a disability determination "cannot be made on the basis of medical factors alone at

4

step three of the evaluation process," the ALJ must identify the claimant's "functional

5

limitations and restrictions" and assess his or her "remaining capacities for work-related

6

activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity

7

assessment is used at step four to determine whether he or she can do his or her past relevant

8

work, and at step five to determine whether he or she can do other work. Id.  It thus is what the

9

claimant "can still do despite his or her limitations." Id.

10

A claimant's residual functional capacity is the maximum amount of work the claimant

11

is able to perform based on all of the relevant evidence in the record. Id.  However, a

12

claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.

13

Thus, the ALJ must consider only those limitations and restrictions "attributable to medically

14

determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ

15

also is required to discuss why the claimant's "symptom-related functional limitations and

16

restrictions can or cannot reasonably be accepted as consistent with the medical or other

17

evidence." Id. at *7.

18

The ALJ found that Mr. Wheeler had the following RFC:

19

Exertionally, the claimant can lift and carry 10 pounds frequently and 20
pounds occasionally.  He can sit, stand and walk for 6-hours in each activity

20

(cumulatively, not continuously) in an 8-hour workday with normal breaks.
His push/pull exertional capacities, in his right upper and bilateral lower

21

extremities, are unlimited to the weight levels that he can lift-and-carry, as set
forth above.

22

The claimant's manipulative non-exertional limitations are that he can perform

23

non-frequent manipulation of objects from waist level to shoulder level with his
non-dominant left arm.  Because of his left shoulder atrophy and pain, he is

24

precluded from any lifting and carrying with his left arm and shoulder.  Further,
the undersigned finds he must avoid reaching and grasping above shoulder

25

level with his left arm.  Lastly as he is not on any narcotic pain medication
regimen, the undersigned finds he has no other exertional or non-exertional

26

limitations.

27

Tr. 17.

28

At step four of the sequential analysis, the ALJ explained that he "adopted the medical

opinion of Dr. Di Paola into the claimant's overall residual functional capacity."  Tr. 16.  Two

REPORT AND RECOMMENDATION
Page - 21

months before the ALJ's decision, Dr. Di Paola opined that as of September 5, 2006, plaintiff's restrictions "remained the same." Tr. 337. The most recent record from Dr. Di Paola regarding his opinion on plaintiff's specific restrictions, dated May 6, 2004, opined that plaintiff was not able to push/pull with his left hand or arm, crawl, climb, or reach. Tr. 225. In contrast to Dr. Di Paola's opinion, the ALJ failed to find plaintiff had limitations pushing and pulling with his left hand or arm, and failed to find that plaintiff could not crawl, climb, or reach (although the ALJ did find that plaintiff should avoid reaching and grasping above shoulder level). Accordingly, the ALJ failed to properly consider Dr. Di Paola's opinion at step four of the sequential analysis. Although the ALJ adopted Dr. Di Paola's opinion, it is not clear why the ALJ failed to include all the functional limitations found by Dr. Di Paola in plaintiff's residual functional capacity assessment. The ALJ's failure to include all the limitations that Dr. Di Paola found was error. Remand for reconsideration of the medical evidence is proper.

### F.      THE ALJ'S STEP FIVE ANALYSIS

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (8th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that

1
2

description those limitations he or she finds do not exist.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

3

     The ALJ posed the following hypothetical to the vocational expert,

4
5
6
7
8

ALJ:  Let me describe a hypothetical person to you and that would be 41-year-old male with a twelfth grade education and the same past relevant work as you have identified here.  This hypothetical person is capable of a full range of light work with one exception and that is that the hypothetical person is unable to use the non-dominant upper extremity for any purpose other than balance and perhaps light objects.  Let me interrupt my hypothetical.  Mr. Wheeler, are you able to write?  You have manipulation in your left hand, it's just your shoulder.  You can't move your shoulder, right?

9

Answer:  Right.

10
11

ALJ: Okay.  So, this person has manipulative abilities with their left upper extremity but is unable to move his shoulder, so we would have no lifting with the left non-dominant upper extremity.

12

Tr. 356-57.  This question does not address all of the limitations Dr. Di Paola opined plaintiff

13

had, particularly his inability to push/pull with his left hand or arm, crawl, climb, or reach.  Tr.

14

225 and 337.  As such, the Court can not say that the question posed to the vocational expert

15

was supported by the medical evidence in the record.  Accordingly, the vocational expert's

16

testimony does not qualify as substantial evidence.  Embrey, at 422.  It is premature to

17

determine whether or not the ALJ would be required to adopt any or all of the limitations

18

listed above.  However, remand for reconsideration of the medical evidence is proper and

19

necessitates a reevaluation of the plaintiff's case at step five.

20

    **G.**     **PARTICIPATION IN THE VOCATIONAL REHABILITATION PROGRAM**

21

     Plaintiff assigns error to the ALJ's failure to consider his participation in an approved

22

vocational rehabilitation program.  (Dkt. #11).  Plaintiff argues that he should be granted an

23

immediate award of benefits for the period of February 3, 2003 to May 6, 2004.  Id.  Pursuant

24

to 20 C.F.R. § 404.316(a) a claimant is entitled to disability benefits beginning with the first

25

month covered by their application in which the claimant meets all the other requirements for

26

entitlement.  Under 20 C.F.R. § 404.316 (c), benefits may be continued after a claimant's

27

impairment is no longer disabling if he or she is participating in an appropriate program of

28

vocational rehabilitation services.

Plaintiff has not shown that he has met all the other "requirements for entitlement" based solely on the medical record for the period of February 3, 2003 to May 6, 2004. Plaintiff is therefore not entitled to an immediate award of benefits for this period. However, as the ALJ erred in his treatment of the medical records, on remand the ALJ should consider whether plaintiff was disabled prior to his participation in the vocational rehabilitation program and whether he is entitled to benefits for the period of time in which he participated in the program.

### H.    THIS MATTER SHOULD BE REMANDED FOR FURTHER ADMINISTRATIVE PROCEEDINGS

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues remain in regard to the medical evidence in the record, the ALJ's development of the record, plaintiff's credibility, his residual functional capacity, and his ability to perform other work existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

It is true that where the ALJ has failed "to provide adequate reasons for rejecting the

1  opinion of a treating or examining physician," that opinion generally is credited "as a matter of

2  law." Lester, 81 F.3d at 834 (citation omitted).  However, where the ALJ is not required to

3  find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that

4  must be resolved, and thus the Smolen test will not be found to have been met.  Bunnell v.

5  Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further, "[i]n cases where the vocational

6  expert has failed to address a claimant's limitations as established by improperly discredited

7  evidence," the Ninth Circuit "consistently [has] remanded for further proceedings rather than

8  payment of benefits."  Bunnell, 336 F.3d at 1116.

9        For the reasons set forth above, the undersigned finds it is not clear the ALJ was

10  required to find plaintiff disabled based on the medical opinion evidence in the record

11  discussed previously, nor has that evidence been fully addressed by a vocational expert.  As

12  such, remand for further proceedings rather than an outright award of benefits is proper here.

13        It also is true the Ninth Circuit has held that remand for an award of benefits is

14  required where the ALJ's reasons for discounting the claimant's credibility are not legally

15  sufficient, and "it is clear from the record that the ALJ would be required to determine the

16  claimant disabled if he had credited the claimant's testimony."  Connett v. Barnhart, 340 F.3d

17  871, 875 (9th Cir. 2003).  The Court of Appeals in Connett went on to state, however, it was

18  "not convinced" the "crediting as true" rule was mandatory.  Id.  Thus, at least where findings

19  are insufficient as to whether a claimant's testimony should be "credited as true," it appears

20  the courts "have some flexibility in applying" that rule.  Id.; but see Benecke v. Barnhart, 379

21  F.3d 587, 593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its contrary holding

22  in Connett).

23        In Benecke, the Ninth Circuit held the ALJ not only erred in discounting the claimant's

24  credibility, but also with respect to the evaluations of her treating physicians.  Benecke, 379

25  F.3d at 594.  The Court of Appeals credited both the claimant's testimony and her physicians'

26  evaluations as true.  Id.  It also was clear in that case that remand for further administrative

27  proceedings would serve no useful purpose and that the claimant's entitlement to disability

28  benefits was established.  Id. at 595-96.  Such is not the case here.  As discussed above, issues

still remain to be resolved on remand with respect to the medical evidence in the record, the

REPORT AND RECOMMENDATION
Page - 25

development of the record, plaintiff's residual functional capacity, and his ability to perform other work.

### III.   <u>CONCLUSION</u>

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 13, 2008**, as noted in the caption.

DATED this 19th day of May, 2008.

Karen L. Strombom
United States Magistrate Judge